MOODY *v.* MUSCOGEE MANUFACTURING COMPANY *et al.*

1. Upon a petition for scire facias to revive a dormant judgment, wherein the plaintiff alleges that the judgment was rendered in a named cause in the same court, a transcript of which is not attached as an exhibit, but full reference to the cause is prayed, and the defendant by his pleadings invokes a construction of the record in aid of his defense, he can not complain that the court considers such record in determining whether the judgment was void for uncertainty, or whether it was final or interlocutory.

(*a*) Even if the defendant's answer be construed to be a plea of nul tiel record, he was not entitled to a jury trial on the issue whether a given judgment had been rendered, as such issue is for decision by the court on an inspection of the record.

2. A decree may be partly final and partly interlocutory; final as to its determination of all issues of law and fact and interlocutory as to its mode of execution. A final decree disposing of all the substantial equities of the case is not made interlocutory by the mere reservation of the right to direct the mode of its execution.

3. Every judgment must be certain and definite as to its amount. This element of certainty is present when the exact amount of the judgment may be ascertained by the subtraction of one named sum from another named sum, as provided in the judgment.

4. Subdivision 2 of section 17 of the original bankruptcy act of 1898, providing "that judgments in actions for fraud or obtaining property by false pretenses or false representations" are not released by a discharge in bankruptcy, comprehends judgments rendered in actions the gist of which is the actual fraud of the defendants. In determining this question courts will look to the pleadings and judgment; and if the relief granted in the judgment is based upon actual, as distinguished from constructive, fraud of the bankrupt, the bankrupt shall not be discharged from its obligation, notwithstanding the action may not be strictly ex delicto in form.

JULY 13, 1910.

Revival of dormant judgments. Before Judge Reid. Fulton superior court. March 9, April 24, 1909.

In the fall of 1908 the Muscogee Manufacturing Company and nineteen other parties, whose names will hereinafter appear, filed their several petitions against John T. Moody in the superior court of Fulton county, alleging that at the March term, 1898, an equitable petition was filed by the Park Woolen Mills et al. against Moody & Brewster, a firm composed of John T. Moody and G. S. Brewster, in which case Brewster was not served; that petitioners were parties plaintiff to the cause, and on June 30, 1900, a final verdict and decree were rendered in the case, under which each

petitioner was given a judgment for an amount which was stated; that no fi. fa. was ever issued upon the judgment; that none of the principal, interest, or costs had been paid, and that by reason of the lapse of time the judgment was dormant; wherefore they prayed that scire facias be issued, and that judgment thereon be revived. Full reference to the cause in which the judgment was rendered was made. The defendant Moody answered the scire facias in each case, admitting that an equitable petition was filed in the superior court of Fulton county by the Park Woolen Mills et al. against Moody & Brewster, a firm composed of himself and G. S. Brewster, in which case Brewster was not served, "that on June 30, 1900, a final decree was rendered in said cause," and that no fi. fa. had ever been issued upon this decree. He alleged, that the judgment, if ever valid, is now dormant; that the alleged judgment sought to be revived in each instance is void for vagueness, indefiniteness, and uncertainty, in that the judgment is not, in practical effect, awarded for any definite sum, and the amount for which the judgment should have been or might have been rendered can not be determined either from the judgment or the pleadings in the cause of the Park Woolen Mills et al. against Moody & Brewster, since the amount stated in the alleged judgment for each one of the plaintiffs is subject to uncertain deductions or credits which must be proved by aliunde evidence; that the several plaintiffs are not entitled to revive their alleged judgments, for the reason that, if ever valid, the judgments have been released by the discharge in bankruptcy of J. T. Moody, granted on May 3, 1902, in a voluntary bankrutcy proceeding, in which the several plaintiffs were listed as creditors of Moody in his schedule filed in that proceeding; and that the debt of each plaintiff was a provable debt in bankruptcy. The defendants in error severally demurred to the answer, on the grounds: (*a*) the answer set up no legal reason why the judgment should not be revived; (*b*) the record discloses that the judgment rendered in the case of Park Woolen Mills et al. against Moody & Brewster is neither vague, indefinite, nor uncertain; (*c*) the discharge in bankruptcy granted to John T. Moody on May 3, 1902, did not apply to the judgments rendered in favor of the several plaintiffs, because the judgments were based upon fraud; (*d*) the defendant is not entitled, under the facts set up in his answer, to a trial by jury. The answer was amended, alleg-

ing, that the decree of June 30, 1900, in the case of Park Woolen Mills et al. against Moody & Brewster, referred to in the petitions for scire facias, did not contain a final judgment against the defendant or the firm of Moody & Brewster, that the alleged judgment was interlocutory only, and did not finally fix and settle the rights of the parties to the litigation, but left the rights to be determined at some future date, the cause being retained for that purpose; that no final judgment was ever rendered; and therefore that the plaintiffs have no judgments in their favor, capable of being revived against the defendant. The demurrers to the answer were renewed, and sustained by the court, who struck the answers as amended, and entered up judgment reviving the alleged dormant. judgments in favor of the respective applicants.

The cause of Park Woolen Mills et al. v. Moody & Brewster (wherein the decree of June 30, 1900, was rendered and to which reference is made in the several petitions for scire facias and the answers thereto) was an equitable petition by the creditors, alleging, in substance, that in 1897 and 1898 J. T. Moody and G. S. Brewster were engaged in several businesses under different trade names in the city of Atlanta, and in the latter part of 1897 they entered into a general dry goods and notion business, opening several stores in Atlanta, and were traders engaged in such business; that the defendants were insolvent; that Brewster had absconded; that Moody, in behalf of the partnership, had on the previous day executed a large number of mortgages, approximating $77,000; that the goods covered by these mortgages were goods bought from complainants and other creditors, and utilized by the defendants as a basis for loans to pay antecedent debts not arising from the purchase of the goods, the genuineness of which debts was not admitted; that these acts amounted to a fraud upon defendants' creditors; that the goods of petitioners were purchased by Moody & Brewster without any intention at the time to pay for same; that the mortgages are void, and petitioners had a right to identify and reclaim their goods. The prayers were: that the defendants be restrained from further changing the status of their business; that a receiver be appointed: that the assets of the firm be marshaled; that they be allowed to reclaim their goods as against all of the mortgages, except one which was not attacked, and that they have a judgment for whatever goods they could not claim. The original

petition was amended by alleging that the firm of Moody & Brewster had been operating in many lines of business under different names (stating them); that they had indiscriminately used the money from each of the concerns operated by them and the dry goods business for the furtherance of their interests; and that the business of one could not be separated from that of the other; and by further alleging fraud in certain transactions between J. T. Moody and his sister, in that Moody had conveyed to her certain land, which conveyances were made for the purpose of hindering, delaying, and defrauding creditors, and in a similar transaction with the nephew of the absconding partner, G. S. Brewster. The petition was again amended, making the Laurel Mills Manufacturing Company and the Tennessee Woolen Mills, two of the plaintiffs in the present litigation, parties to the case, and alleging that the defendants purchased goods from intervenors, representing themselves to be solvent, and that the goods were sold upon the credit of these statements, when as a matter of fact the defendants had no intention of paying for the goods, and fraudulently concealed their intent. This amendment adopted all of the prayers of the original petition. Numerous other creditors filed their interventions (20 of them being parties to the present litigation), all of them, except as hereinafter noted, setting up substantially (and severally expressly adopting) the allegations and prayers of the original bill, and alleging in substance as follows: that they sold and delivered to Moody & Brewster goods amounting to a certain sum, as shown by their attached bill of particulars; that in order to obtain this credit the defendants made fraudulent statements, to the mercantile agencies, of their wealth and financial responsibility, for the purpose of having said statements communicated to petitioners (intervenor in each case), which statements were actually communicated, upon the faith of which petitioners sold the goods; that these statements were made and the goods purchased under a scheme to defraud, and with no intention to pay for the goods; and that the defendants engaged in the general scheme of purchasing a large quantity of goods, far in excess of their needs, procuring them on credit by false representations, with the deliberate purpose and intention of placing mortgages upon them, to further their general scheme of fraud, and prefer certain creditors. The prayers were that it be adjudged that the title to

the goods did not pass, because of the fraud, and that they be allowed to identify and recapture their goods, and have judgment for such as may not be reclaimed. The substance of the interventions of the Third National Bank of Atlanta and the Liebig Manufacturing Company appear in the last division of the opinion. The questions of the priorities of liens held by the various intervenors, as between themselves, were also raised by some of the intervenors. The defendant Moody answered for himself individually, and for the firm. The allegations of the various interventions, as well as the original petition, respecting the amounts of indebtedness, the dates, amounts, and execution of the various mortgages as set out, were all admitted. He denied all allegations of fraud or false statements or representations in the procurement of the goods; and alleged, that they did represent themselves to be solvent and fully able to pay, that they were at the time solvent, and that the firm had been rendered insolvent since that time on account of the conduct of Brewster, who had absconded.

The court appointed a receiver to take charge of the assets, and referred the case to an auditor, with direction to hear the evidence and the various contentions of the parties and determine their rights. The auditor filed a report covering the various issues, and exceptions were filed by certain creditors relating to contests with other creditors over the funds. These exceptions were passed upon by a jury, and a decree was entered in general accord with the auditor's report as modified by the verdict upon the issues raised by the exceptions. On June 30, 1900, a decree was entered, adjudging, that the various partnerships under which Moody & Brewster did business were insolvent, and the members thereof were likewise insolvent; "that on or about January 1st, 1898, Moody & Brewster, under whatsoever style they were doing business, and as individuals, were insolvent; and that on or about said date they entered into a general scheme having for its purpose the purchase of goods and the obtaining of credit, both for the money and goods, to defraud those with whom they might deal, and that they then and thereafter purchased goods and obtained credits with no intention to pay therefor, and with intent generally to defraud their creditors; and as to individual instances where parties to said cause have been found by the auditor to be entitled to rescind their sales and reclaim goods identified, the auditor's report as to them is

hereby adopted and made a part of this decree, both as to findings of a general scheme to defraud and as to special frauds perpetrated upon particular parties." After fixing the priority of certain liens in accordance with the auditor's report, the decree then proceeds: "The following complainants and intervenors in said cause, having chosen to rescind their sales, and having identified certain goods in the hands of the receiver, are decreed to be entitled to rescind said sales because of fraud practiced upon them by Moody & Brewster, and to be entitled to reclaim the proceeds of the goods so identified by them and sold by the receiver; subject, nevertheless, to their proportionate part of such costs as are hereinafter taxed against them, and subject to such other prior claims and liens as in this decree have been found to be superior to their right of reclamation, which they are hereby likewise charged with proportionately. The amounts realized from the sale of said goods are respectively set opposite the names of the parties." Then follow the names of these intervenors, and the amounts opposite their names: Abegg & Rusch, $1,381.00; Atlanta Woolen Mills, $3,276.14; Cleveland Woolen Mills, $90.43; Glens Falls Shirt Company, $500.17; Laurel Mills Manufacturing Company, $1,917.17; Owensboro Woolen Mills, $4,553.83; Old Kentucky Woolen Mills, $1,800.47; Porter Brothers & Co., $138.61; Roaring Springs Blank Book Company, $384.64; Strauss, Sach & Co., $209.81; E. T. Steele & Company, $946.49; Scheuer Brothers, $374.38; Silverstein, Hecht & Co., $1,620.07; Tennessee Woolen Mills, $1,394.59. The next paragraph of the decree is: "The following complainants and intervenors, who under previous orders of this court have been allowed to take from the possession of the receiver certain goods identified by them, are hereby decreed to be entitled to reclaim said goods and to retain the same, but are hereby required to pay into the hands of the receiver such a proportion of the costs and expenses and liens, which are by this decree fixed as prior to their right of reclamation, as may be necessary to comply with the terms of this decree, less ten per cent. of the invoice cost thereof already paid into the hands of the receiver under the orders of court. The invoice cost of the goods so taken out by them is respectively set opposite their names as follows." Guiterman Brothers, $586.11, were the only intervenors, parties to the present litigation, who reclaimed their goods under this paragraph of the decree. The Atlanta Woolen Mills

were also "decreed to recover of and from the Fourth National Bank of Atlanta the following accounts, proceeds of goods sold by it to Moody & Brewster, or, where the same have been collected by said bank, the full proceeds of such collection; said accounts being as follows:" Then follows a list of such accounts, giving the amount of each account, aggregating $1,822.04. In the 28th paragraph the Cleveland Woolen Mills were "decreed to recover of the Fourth National Bank of Atlanta the following accounts, proceeds of goods sold by it to Moody & Brewster, where said accounts or any of them have been collected by said bank, the full proceeds thereof collected by said bank shall be paid by said bank to said receiver, said accounts being as follows." Then follows a list of the accounts, aggregating $2,174.22. It is "further ordered and decreed that the following named accounts are the proceeds of the goods of the Berkeley Chemical Company which were sold by it to Moody & Brewster under such fraudulent circumstances as hereinbefore found as authorized them to rescind said sale upon discovery of said fraud, and to reclaim said goods or their proceeds wherever found, except in the hands of innocent purchasers for value and without notice; and that said Berkeley Chemical Company is hereby awarded the open accounts hereinafter set forth, and the receiver is directed to turn over said accounts to said Berkeley Chemical Company. And the Fourth National Bank is decreed not to be entitled to any part of said open accounts which it may have received as security for the pre-existing indebtedness to said bank at the time of the failure of the said Moody & Brewster, or the cash collections on any such open account so received. The items of said accounts as appearing by the books of Moody & Brewster, as shown cn page 152 of the brief of evidence in said cause, being as follows:" These items aggregate $3,440.50. The next paragraph was as follows: "It is further ordered, adjudged, and decreed that the following parties are entitled to recover of the defendants, Moody & Brewster, by general judgment the gross amounts which are respectively set opposite their names, which amounts and judgments are to be respectively credited with any sums which any of said parties received from the receiver in this case under this decree, and from collateral securities which they may have held as security therefor, namely:" Then follow; Abegg & Rusch, $1,764.37; Atlanta Woolen Mills, $5,675.52; Berkeley Chemical Company, $25,-

121.48; Cleveland Woolen Mills, $2,589.94; Glens Falls Shirt Company, $630.55; Guiterman Brothers, $659.23; Liebig Manufacturing Company, $14,756.70; Laurel Mills Manufacturing Company, $3,724.52; Muscogee Manufacturing Company, $1,338.57; Mechanics National Bank, $21,036.48; Owensboro Woolen Mills, $5,552.39; Old Kentucky Woolen Mills, $2,378.90; Porter Brothers & Company, $374.65; Roaring Springs Blank Book Company, $496.31; Strauss, Sach & Company, $345.23; Steele & Company, $1,050.26; Scheuer Brothers, $700.62; Silverstein, Hecht & Company, $3,032.78; Tennessee Woolen Mills, $1,917.51; Third National Bank, $8,500.00. Then follows, "For the balances for which general judgments are hereby rendered, the clerk of the court shall, upon application, issue separate executions." After giving directions to the receiver as to the disposition of funds in his hands, the decree concluded with the following paragraph: "The right is reserved to make such further orders, judgments, and decrees as may be necessary to carry into effect the true intent and meaning of this decree."

The auditor's report was filed on the 8th of December, 1899, and the decree of the court entered up thereon on June 30, 1900. After this date the court passed different orders for the direction of the receiver in disposing of a small balance of property of Moody & Brewster, and direction as to other matters; and the receiver on March 11, 1901, filed his final report of disbursements and receipts, which was approved by the court, and the receiver discharged.

*Anderson, Felder, Rountree & Wilson, Candlers, Thomson & Hirsch, Howard Van Epps,* and *Thomas F. Corrigan,* for plaintiff in error.

*John L. Hopkins & Sons, King & Spalding, Slaton & Phillips, J. E. & L. F. McClelland,* and *Horton Brothers & Burress,* contra.

EVANS, P. J. (After stating the foregoing facts.)

1. In reaching its decision and in granting its judgment sustaining the demurrers to the defendant's answer to the scire facias, the court considered and treated as a part of the record in the case the entire proceedings, orders, and decrees, including the final report of the receiver and the orders thereon, in the case of Park Woolen Mills et al. *v.* Moody & Brewster, over the objection that they were not a part of the record in the scire facias proceeding.

The defendant filed no demurrer to the various petitions, complaining that the exhibits were not attached. Scire facias to revive a dormant judgment is not an original action, but a continuation of the suit in which the judgment was obtained. Civil Code, § 5380. The defendant may plead nul tiel record in bar of the relief sought, in which case plaintiff must produce the record, and the court will try that issue on an inspection of the record. But in each of the scire facias petitions in this case the plaintiff alleged that the Park Woolen Mills et al. filed their petition against Moody & Brewster, in the same court to the March term, 1898, in which case each applicant intervened, and that on June 30, 1900, a final decree and verdict were rendered in favor of intervenor for a stated amount and "full reference to the case above mentioned is made." In his answer to the petition for scire facias the defendant admitted the filing of the petition of the Park Woolen Mills et al. v. Moody & Brewster, service thereof on him, that applicant intervened in the cause, and "that on June 30, 1900, a final verdict and decree was rendered in said cause." But defendant denied that applicant was given a judgment for any amount. He also further averred that the judgment was void for uncertainty and vagueness. By amendment the defendant averred that the decree of June 30, 1900, referred to in the petition for scire facias, did not contain a final judgment against the defendant, but that the judgment was interlocutory merely, and left the rights of the parties to be finally determined at some future day, the cause being retained for that purpose; he also demanded a trial by jury on this issue. It is not the province of a jury to declare upon the legal effect of a judgment. *Stewart* v. *Sholl*, 99 *Ga.* 539 (26 S. E. 757). So that, even if the defendant's answer had been strictly a plea of nul tiel record, the fact as to whether a given judgment had been rendered is determinable by the court only on inspection of the record. Ibid. Under the pleadings in this case there was no necessity for the production of the record as evidence, because it was before the court as part of the pleadings. The petition for scire facias prayed reference to the record, and the defendant invoked a ruling in his behalf upon that record. The record was not attached as an exhibit, but was a record of the court which was trying the scire facias proceeding. The third equity rule (Civil Code, § 5694) requires that all exhibits shall be filed with the petition or answer. But where the

exhibits referred to are voluminous pleadings and records of the court where the case is pending, the court may consider such records as if they were attached as exhibits. *Graham* v. *Dahlonega Gold Mining Company,* 71 *Ga.* 296; *Millbank* v. *Penniman,* 73 *Ga.* 136. It was said in *Lyons* v. *Planters Loan and Savings Bank,* 86 *Ga.* 485 (12 S. E. 882, 12 L. R. A. 155), that it is doubtful whether the equity rule touching exhibits to pleadings is applicable in its full force since the act of 1887, establishing uniformity in pleadings, but that in all events, where there is no probability that the defendant was unacquainted with the contents of the record, and has suffered no substantial disadvantage in the omission to set it out as an exhibit, a judgment otherwise correct will not be reversed for this lack of formality. To which we may add, that where the record was referred to as on file, and the defendant by his pleadings invoked a construction of the record, he can not complain that the court considered such record in determining whether the judgment was void for vagueness, or because it was only interlocutory.

2. The general practice under our system of pleading is to enter only one final decree on the merits of an equity cause. The practical advantage of concluding all issues in a single comprehensive decree is the prevention of a review of litigated cases by piecemeal. However desirable it may be to conclude a litigation with one judgment, the law does not require it, nor is it always possible to dispose of complicated equitable causes in one final decree. As said by Judge Lewis in *Booth* v. *State,* 131 *Ga.* 756 (63 S. E. 505), "It is difficult sometimes in actions on the equity side of the court, especially in cases of receivership, to determine whether an order is administrative in its character, resting in the sound discretion of the chancellor, or final in its nature. To be final it does not necessarily mean that the judgment disposes of the entire case. A judgment may be rendered separable from a judgment disposing of the entire case, and yet be a judgment that is final as to some of the substantial rights of the parties as contended for in their pleadings. It is final when, as to the subject-matter of the judgment, any of the substantial rights of the parties litigant are finally settled by the judgment." A decree which settles all of the substantial equities in a case must be regarded as a finality upon such questions. A decree may be partly final and partly interlocutory; final as to its de-

termination of all issues of fact and law, and interlocutory as to its mode of execution. Adams *v.* Sayre, 76 Ala. 509; Merle *v.* Andrews, 4 Texas, 200; Gray *v.* Cook, 24 How. Pr. 432. The original action which eventuated in the decree of June 30, 1900, was an equitable petition by creditors against alleged fraudulent and insolvent debtors, to rescind their sales of goods on account of fraud, to reclaim all goods which they could identify, and to recover judgment for whatever goods they could not claim, and for other relief, special and general. From time to time various creditors intervened, and in their respective interventions set forth a gigantic scheme of the debtors to defraud every one they could induce to extend them credit. The debtors had sold some of the goods and hypothecated the accounts and notes representing such sales with other creditors, and just before the filing of the petition the debtors had executed several mortgages. There were conflicting equities between the creditors. The whole matter was referred to an auditor, who filed his report, which as to conflicting equities of the creditors was modified by a verdict on exceptions thereto. This was the general aspect of the case when the court entered the decree of June 30, 1900. Every substantial equity had been established and adjusted between the parties. The fraud of the defendants was adjudicated; the value of the goods which were fraudulently procured was found; the value of the goods reclaimed by each creditor was found; and finally it was adjudicated that each of the various creditors was to have judgment for the difference between the value of the goods out of which each was defrauded and the sum named in the decree as having been received by each from reclamation of goods, and for which sum—easily ascertained by the arithmetical process of subtraction—the clerk was directed to issue execution upon application of the several creditors. This is our interpretation of the decree,—an interpretation which seems so clear to us that neither judicial precedent nor an elaborate analysis of all of its terms would be profitable or necessary to prove its accuracy.

But it is urged that the concluding paragraph of the decree, wherein "the right is reserved to make such further orders, judgments, and decrees as may be necessary to carry into effect the true intent and meaning of this decree," renders it a mere decretal or interlocutory order. We do not think so. Every substantial equity

and all the rights of the parties had been finally adjudicated, and in the administration of such a large estate, with so many parties with overlapping equities, it was more than likely that minor matters might arise respecting its mode of execution; and this reservation was intended to cover such. All subsequent orders, including that which finally discharged the receiver, related simply to the mode of executing the decree, and demonstrate that our construction is not only correct, but was the one acted upon by the court. The rule is well established that a final decree disposing of the substantial equities of the case is not made interlocutory by the mere reservation of the right to direct the mode of its execution. 23 Cyc. 673; Campbell *v.* Crutcher, 3 Tenn. Chan. 253; Mead *v.* Christian, 50 Ala. 561; Jones *v.* Wilson, 54 Ala. 50.

3. Nor is the decree of June 30, 1900, void for vagueness, indefiniteness, and uncertainty, in that judgment is awarded for no definite sum. It is fundamental that a judgment should be certain and definite, or be capable of being made so by proper construction. 23 Cyc. 671. The action was a creditor's bill; the parties who intervened as creditors were numerous; the overlapping equities of the creditors, and the multitude of issues, necessarily required considerable space in the statement of the various adjudications of the equities. It was stated in one paragraph of the decree that each creditor was entitled to a general judgment for the gross amount opposite his name, to be credited with any sums received under the decree and from collateral securities awarded to them. Other paragraphs stated the amount which each creditor received from reclamations and from collateral securities. So that the calculation as to the amount of the judgment awarded to each creditor was but the simple process of subtraction, and a palpable illustration of the maxim id certum est quod certum reddi potest. Whether the decree was constructed with a view to condensation, or to tabular classification, or to conform to the peculiar literary style of the draughtsman, is mere conjecture. The mode of ascertaining the amount is given with precision; the mathematical process is simple and accurate, and the result is just as intelligible and certain as if the calculation had been made and the result incorporated in the decree. A verdict or judgment for a given sum as principal with interest thereon from a given date, has always been regarded as not wanting in certainty. The problem of ascertaining

the difference between two numbers is by no means as complex as that of the calculation of interest.

We have carefully gone over the calculations of the amount awarded to each defendant in error. We find the several amounts correctly stated in the petition for scire facias of the following parties: Abegg & Rusch; Guiterman Brothers, Glens Falls Shirt Company; Mechanics National Bank; Liebig Manufacturing Company; Laurel Mills Manufacturing Company; Muscogee Manufacturing Company; Old Kentucky Woolen Mills; Owensboro Woolen Mills; E. T. Steele & Company; Silverstein, Hecht & Company; Berkeley Chemical Company; Porter Brothers & Company; Third National Bank of Atlanta. With respect to the other petitions for scire facias, the amount awarded by the decree is incorrectly stated. To the Roaring Springs Blank Book Company judgment was awarded for $496.31, less $384.61, to wit $111.67; to Strauss, Sach & Company judgment was awarded for $345.23, less $209.81, to wit $135.42; to the Tennessee Woolen Mills judgment was awarded for $1,917.51, less $1,394.59, to wit $522.92; to Scheuer Brothers judgment was awarded for $700.62, less $374.38, to wit $226.24. In the decree it was provided, inasmuch as some of the goods reclaimed by the Atlanta Woolen Mills had been manufactured into the finished product, that the cost of manufacturing, to wit $598.69, should first be paid; after deducting this sum from the proceeds of the reclaimed goods, $3,276.14, the net credit of $2,677.45, and the $1,822.04, the amount of collaterals turned over, both credits aggregating $4,499.49, should be deducted from the gross amount, $5,675.52, leaving $1,176.03 as the amount for which judgment was rendered. The Cleveland Woolen Mills was awarded a judgment for $2,589.94, less the amount of their accounts representing $2,174.22 of their goods, which had been sold by the defendants, leaving a net recovery of $315.72. The amounts which have been thus erroneously calculated should be corrected by these figures.

4. Was the defendant Moody acquitted of the judgments of the defendants in error by his discharge in bankruptcy? The original bankruptcy act of 1898 permitted a discharge from all provable debts, with certain exceptions, one of which was from a "judgment in an action for fraud or obtaining property by false pretenses or false representations." Section 17, subdivision 2, bankruptcy

act of 1898 (30 Stat. 544, 550, U. S. Comp. Stat. 1901, p. 3428). This provision of the bankrupt act was amended in 1903; but as the bankrupt's discharge was obtained prior to the amendment, the question for decision is not affected by the amendment, but must be determined by the provisions of the original act. The authorities seem to be uniform in holding that in order to constitute a judgment as recovered for fraud, so as to prevent its release by section 17, subdivision 2, of the bankruptcy act of 1898, the fraud and deceit must have been the gist of the action. The authorities further hold that the fraud must be positive fraud or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, which may exist without an imputation of bad faith. The bankruptcy act of 1867 did not require claims for fraud to be reduced to judgment, as does the act of 1898, as a condition to prevent their release by a discharge in bankruptcy. "The reason for this change," as suggested by Mr. Justice Brown, in delivering the opinion in Crawford *v.* Burke [195 U. S. 176, 25 Sup. Ct. 9, 49 L. ed. 147], "may be that Congress did not intend to offer any inducement to change unliquidated claims into actions for fraud, and therefore limited the exception from the operation of the discharge to such cases only as had been litigated and reduced to actual judgment. When such is the case, we think a correct interpretation of the law does not require a close examination into the form of the action to determine whether technically it is one ex delicto or otherwise, but the real question is, was the relief granted in the judgment based upon actual, as distinguished from constructive, fraud of the bankrupt. If the judgment is thus founded, whatever is the form of the action, it is the intent and purpose of the law that the bankrupt shall not be discharged from it, but shall still rest under its obligation, so far as the bankrupt law is concerned." Bullis *v.* O'Beirne, 195 U. S. 620 (25 Sup. Ct. 123, 49 L. ed. 340). We will now proceed to analyze the proceedings and decree in the case of Park Woolen Mills et al. *v.* Moody & Brewster, to ascertain if the judgments of the various defendants in error are predicated upon the actual fraud of Moody & Brewster. The original petition was in the nature of a creditor's bill, broader in scope than the statutory proceeding under the insolvent trader's act. At the time the action was commenced the insolvent trader's act (Civil Code, § 2716 et seq.) permitted the administration of the assets of an in-

solvent trader by a court of equity upon the application of one or more creditors representing one third in amount of the unsecured debts of the insolvent trader. The absence of the jurisdictional averment that the moving creditors represented one third in amount of the unsecured indebtedness, together with charges of positive fraud by the debtors (which is not required in the statu-- tory action) strongly tends to characterize and classify the proceeding as a creditor's bill under the old established chancery practice. Creditor's bills are very generally. employed to settle up the estates of insolvent debtors, to prevent a multiplicity of suits by creditors, to set aside fraudulent conveyances, to marshal the assets of the debtor, and to administer them according to equitable principles. In the original petition it was alleged that the goods of the petitioners were fraudulently purchased by Moody & Brewster, with no intention of paying therefor, and inter alia the plaintiffs prayed that they be allowed to reclaim their goods and have judgment for whatever goods they could not claim. In the subsequent amendments, and in the interventions of all creditors who had sold merchandise to the defendants, a general scheme to defraud all creditors, and a specific scheme to defraud the particular creditor, were averred. In all of them reclamation of goods sold was claimed on the ground that the title did not pass on account of the debtors' fraud, and judgment was asked in some for the value of the goods, in others "for whatever goods they can not claim," that is to say the value of the goods fraudulently converted. The dominant note in every intervention, as well as in the original petition, was for the rescission of the sales on the ground of fraud. The creditors' right to reclaim their goods depended upon their right to a rescission of the sale. The pleadings, the auditor's report, and the decree show the point of pressure to have been the effort of each creditor to identify and retake his goods, and keep them out of the general fund. Indeed, the general fund obtained from other sources was a negligible quantity. The fight on this line was between the creditors, Moody being hardly an interested spectator. After filing an answer he became passive and inactive; not even excepting to the auditor's finding that he had perpetrated such a colossal fraud. The attitude of the parties to the various issues is referred to as illustrating that the contending parties in the heat of the conflict regarded the defendants' fraud as the gravamen of the suit. It is

wholly inconsistent that the plaintiffs should be entitled to reclaim such of their goods as could be identified, and also have a judgment for the contract price, less the goods reclaimed. A sale can not be affirmed in part and repudiated in part. The primary relief sought being the reclamation of the goods, we must construe that the excess judgment was for damages sustained from failure to recapture the balance of the goods which had been fraudulently converted. The cost of the goods may be considered in connection with other facts, in estimating the damages sustained; though evidence of cost alone may be insufficient to prove market value. *Watson* v. *Loughran*, 112 *Ga.* 837 (38 S. E. 82). The coincidence between the judgment rendered and the invoice price demonstrates neither that the court treated the recovery as based on the contract, nor that the decree was without evidential support other than the invoice value of the goods. The decree suggests at least three very strong indications that the recovery was based on the fraud of the defendants: first, the court took pains to especially adjudge the defendants' fraud; second, reclamations based on rescission were allowed; third, no notice was taken of any interest prior to the decree. We therefore reach the conclusion that the gravamen of the action was the fraud of the defendants. Was that fraud positive or actual fraud? It would be idle to again repeat the character of the fraud, so inadequately summarized in general terms in the statement of facts. Such fraud is actual, and not constructive. *Ames* v. *Moir*, 138 U. S. 306 (11 Sup. Ct. 311, 34 L. ed. 951); *Forsyth* v. *Vehmeyer*, 177 U. S. 177 (20 Sup. Ct. 623, 44 L. ed. 723).

It appears from the intervention of the Liebig Manufacturing Company that whatever fraud may have been perpetrated upon it by Moody & Brewster was waived, and the judgment rendered upon its intervention was simply for the balance due on its notes. It appears that on the day before the filing of the creditors' bill Moody & Brewster executed a mortgage to secure one of the notes due the Liebig Company. This mortgage covered fertilizers which it had sold Moody & Brewster, and also embraced other fertilizers which were purchased by Moody & Brewster elsewhere. The Liebig Manufacturing Company originally intervened for the purpose of protesting against the temporary receiver's taking possession of the fertilizers covered by its mortgage. It was allowed

to proceed with the foreclosure, and amended its intervention by showing the net amount it had received from the proceeds of the foreclosure sale. It also further amended its intervention, asking judgment upon another note, adopting only so much of the allegations of the original petition as was necessary for the relief for which it prayed. Thus it appears that at the very time of the failure of Moody & Brewster the Liebig Manufacturing Company took a mortgage upon goods including some sold by it; and, when the creditors filed their petition alleging the fraudulent scheme of Moody & Brewster, instead of disaffirming the sale it ratified the sale by insisting upon proceeding with the foreclosure of the mortgage, and received the proceeds thereof. If the original transaction between it and Moody & Brewster was infected with fraud, it was waived by its subsequent conduct. We therefore think that the judgment as to it was not based on fraud, as that fraud, if any, had been purged by the voluntary action of this intervenor.

It also affirmatively appears from the intervention of the Third National Bank of Atlanta that its debt was created by a loan made in the usual course of business, secured by certain collaterals, supposed at the time that the loan was made to be sufficient; but, on account of the decline in the price of cotton, it was not able to collect from the collaterals a sufficient amount to discharge its loan; and judgment was asked for the balance due on the note, including the principal and interest. No fraud was alleged to have entered into this transaction; and therefore this debt was released by the discharge in bankruptcy.

The judgments in all the cases, except the two wherein the Liebig Manufacturing Company and the Third National Bank of Atlanta are defendants in error, are *affirmed;* and as to these two the judgments are *reversed.*        *All the Justices concur.*